# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

UNITED STATES OF AMERICA ex rel.
SHARON HILLE, B.A., C.A.P., and
RENEE S. KEENE,

STATE OF COLORADO ex rel.
SHARON HILLE, B.A., C.A.P., and
RENEE S. KEENE,

STATE OF GEORGIA ex rel.
SHARON HILLE, B.A., C.A.P., and
RENEE S. KEENE,

STATE OF INDIANA ex rel.
SHARON HILLE, B.A., C.A.P., and
RENEE S. KEENE,

STATE OF MARYLAND ex rel.
SHARON HILLE, B.A., C.A.P., and
RENEE S. KEENE,

STATE OF MINNESOTA ex rel.
SHARON HILLE, B.A., C.A.P., and
RENEE S. KEENE,

STATE OF NEW MEXICO ex rel.
SHARON HILLE, B.A., C.A.P., and
RENEE S. KEENE,

STATE OF NORTH CAROLINA ex rel.
SHARON HILLE, B.A., C.A.P., and
RENEE S. KEENE,

STATE OF TEXAS ex rel.
SHARON HILLE, B.A., C.A.P., and
RENEE S. KEENE,

CASE NO.: 6:15 -CV-1446 -OR 41DAB

**FILED UNDER SEAL**

**JURY TRIAL DEMANDED**

FILED

2015 SEP -4  PM 12: 52

US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

STATE OF VIRGINIA ex rel.
SHARON   HILLE,   B.A.,   C.A.P.,   and
RENEE S. KEENE,

     **Plaintiffs-Relators,**

v.

COLONIAL   MANAGEMENT   GROUP,
L.P.;   COLONIAL   GENERAL,   LTD;
COLONIAL GP, L.P.; CMG HOLDINGS,
LP;   WARWICK   GROUP,   INC.;
WARWICK GROUP II, INC.; and MARK
KOZAK;

     **Defendants.**

### FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

Co-Relators Sharon Hille, B.A., CAP ("Relator Hille"), and Renee S. Keene (formally Seabridge) ("Relator Keene") (collectively the "Relators"), on behalf of themselves, the United States of America, and the States of Colorado, Georgia, Indiana, Maryland, Minnesota, New Mexico, North Carolina, Texas, and Virginia, bring this action under 31 U.S.C. §§ 3729-3732 ("False Claims Act") and each Plaintiff-State's respective False Claims Act ("State False Claims Acts") to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States and themselves, and each applicable State False Claims Act on behalf of the Plaintiff-States and themselves. By and through their counsel, Relators hereby file this False Claims Act Complaint and Demand for Jury Trial ("Complaint") against Colonial Management Group, L.P. ("Colonial"), Colonial General, LTD ("Colonial General"), Colonial GP, L.P. ("Colonial GP"), CMG Holdings, LP (d/b/a "Colonial Management"), Warwick Group, Inc. ("Warwick"), Warwick Group II, Inc. ("Warwick II"), and Mark Kozak ("Kozak") (collectively, the "Defendants"), and allege as follows:

2

## NATURE OF ACTION

1.      Relators bring this action on behalf of themselves, the United States of America, Colorado, Georgia, Indiana, Maryland, Minnesota, New Mexico, North Carolina, Texas, and Virginia, against Defendants for their violations of the federal False Claims Act ("federal FCA"), 31 U.S.C. §§ 3729-3732, *et seq.*, and the applicable Plaintiff-States' respective False Claims Act ("state FCAs"), to recover all damages, penalties, and other remedies established by the federal FCA on behalf of the United States and themselves, and each applicable state FCA on behalf of the Plaintiff-States and themselves.

## JURISDICTION AND VENUE

2.      This action arises under the federal FCA, as amended, 31 U.S.C. §§ 3729 *et seq.*, and the state FCAs.

3.      This Court has jurisdiction over the claims arising under the federal FCA pursuant to 31 U.S.C. §§ 3732(a) and 3730(b), and 28 U.S.C. §§ 1345 and 1331.

4.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the acts proscribed by 31 U.S.C. § 3729, *et seq.*, and complained of herein, took place in this District.

## PARTIES

5.      Relator Hille is a Certified Addiction Professional. She was employed by Colonial as the Program Director in the Ocala, Florida center and, later, as Colonial's Deputy Compliance Officer. During her employment, Relator Hille primarily conducted compliance audits of Colonial's centers and compiled reports relating to the audits to present to Mike Ford ("Ford"), Colonial's Director of Accreditation & Corporate Compliance. In her position, Relator Hille obtained first-hand knowledge of the fraudulent practices of Colonial. Relator Hille was employed by Colonial from April 9, 1999 until February 28, 2014.

3

6. Relator Keene is the former executive assistant to Christopher Hassan ("Hassan"), Colonial's former CEO. In that position, Relator Keene was exposed to many of the fraudulent practices of Colonial. Relator Keene was employed by Colonial from May 9, 2011 until May 20, 2013.

7. Relators are original sources of this information. Relators have direct and independent knowledge of the information on which the allegations are based and have voluntarily provided the information to the United States before filing this action under the federal FCA and applicable state FCAs.

8. Colonial Management Group, L.P. ("Colonial") operates methadone dispensary centers for profit, which serve more than 20,000 patients. (Colonial Marketing Pamphlet). Its principal address is 8529 Southpark Circle, Suite 270, Orlando, Florida 32819.

9. Colonial General is a foreign limited partnership and the general partner of Colonial.[1] In turn, the general partner of Colonial General is Warwick II. Colonial General's principal address is 87th Main Street, 2nd Floor, New Canaan, Connecticut 06840.

10. Colonial GP is a cross reference for Colonial General. Colonial GP lists its principal office as 87th Main Street, 2nd Floor, New Canaan, Connecticut 06840, which is also the address listed for Colonial General.

11. Warwick is a private equity firm engaged in the business of acquiring, recapitalizing and working with management of profitable businesses with revenues up to $100 million. Warwick lists Colonial Management ("CMG Holdings, LP (d/b/a Colonial

---

[1] The Florida Department of State, Division of Corporations, lists Colonial's general partner as Colonial GP, L.P. However, Colonial GP, L.P. is simply a "cross reference name" for Colonial General, LTD. In fact, attempting to view information relating to Colonial GP, L.P. on the division's website (sunbiz.org) only reveals information about Colonial General, LTD.

Management) Orlando, FL") as one of its portfolio companies, although there is no record of CMG Holdings, LP on file with the Florida Department of State, Division of Corporations.

12.     Warwick II is a foreign profit corporation. Warwick II is the general partner of Colonial General, which, in turn, is Colonial's general partner.

13.     Kozak is the Chairman of the Board of Colonial. Additionally, Kozak is a principal and the Managing Director of Warwick and the president of Warwick II. Kozak oversees management of Warwick's portfolio companies, including Colonial. After former CEO Christopher Hassan's ("Hassan") termination on May 17, 2013, Kozak was the acting CEO of Colonial.

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

14.     As required by the federal FCA, 31 U.S.C. § 3730(b)(2), Relators have provided to the Attorney General of the United States, and the United States Attorney for the Middle District of Florida, a statement of all material evidence and information related to this complaint.

15.     As required by their respective State FCAs, Relators have provided the disclosure statement to each of the applicable Plaintiff-States.

16.     The disclosure statement is supported by material evidence known to Relators at the time of their filing, establishing the existence of Defendants' false claims.

17.     The disclosure statement includes attorney-client communications and work product of Relators' attorneys and is submitted to the U.S. Attorney General, the United States Attorney in their capacities as potential co-counsel in this litigation; therefore, the disclosure is confidential.

## THE MEDICARE PROGRAM

18.     Title XVIII of the Social Security Act, known as "Medicare," provides healthcare benefits to qualified individuals and includes two related health insurance programs—hospital insurance (Part A) and supplementary medical insurance (Part B).

19.     Medicare also includes the Medicare Advantage ("MA") program (Part C), formerly known as "Medicare+Choice." 42 U.S.C. §§ 1395w-21 *et seq.*, as amended by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 117 Stat. 2176 (codified at 42 U.S.C. § 1395w-21 note).

20.     Under Part C, Centers for Medicare & Medicaid Services ("CMS") contracts with public or private organizations to offer a variety of health plan options for beneficiaries. Qualified individuals may then opt out of traditional fee-for-service coverage under Medicare Parts A and B and enroll in privately-run managed care plans that provide coverage for both inpatient and outpatient services.

21.     In order to receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the states.

22.     Among the rules and regulations which enrolled providers agree to follow are to: (a) bill Medicare for only those covered services which are medically necessary; (b) not bill Medicare for any services or items which were not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information relating to provider costs or services; (c) not engage in any act or omission that constitutes or results in overutilization of services; (d) be fully licensed and/or certified under the applicable state and federal laws to

perform the services provided to recipients; (e) comply with state and federal statutes, policies and regulations applicable to the Medicare Program; and (f) not engage in any illegal activities related to the furnishing of services to recipients.

## THE MEDICAID PROGRAM

23.     Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* establishes Medicaid, a federally assisted grant program for the states. Medicaid enables the states to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operational procedures.

24.     At all times relevant to this complaint, the United States provided funds to states through the Medicaid program pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act.

25.     By becoming a participating provider in Medicaid, enrolled providers agree to abide by the rules, regulations, policies and procedures governing claims for payment, and to keep and allow access to records and information as required by Medicaid. In order to receive Medicaid funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the state.

26.     42 C.F.R. §§ 455 *et seq.*, expressly states that a provider must certify that he is in compliance with all federal and state statutes and regulations in order to receive payment from Medicaid.

27.     At all times relevant to this complaint, Medicaid constituted a significant source of gross patient revenue for Defendants.

## SPECIFIC ALLEGATIONS

28.     Colonial operates approximately 64 for profit methadone dispensary and purported treatment centers located in 18 states—Alabama, Colorado, Florida, Georgia, Indiana, Maine, Maryland, Minnesota, Missouri, New Hampshire, New Mexico, North Carolina, Oregon, South Carolina, Texas, Utah, Virginia, and Wisconsin—which serve more than 20,000 patients with addictions to opiates such as heroin and opiate-based prescription medications such as Oxycontin, Dilaudid, Percodan, Percocet, and Propoxyphene.

29.     Colonial's Chief Executive Officer was Christopher Hassan from 2010 until his termination on May 17, 2013.

30.     Hassan operated Colonial at the substantial direction of Kozak.

31.     After Hassan's termination in 2013, Kozak acted as CEO and continued to substantially direct the operation of Colonial.

32.     At least 20 of Colonial's centers, located in Maine, Minnesota, New Hampshire, North Carolina, and South Carolina receive federal funding. The centers in Minnesota and North Carolina also received state funding.

33.     Centers in Colorado, Georgia, Indiana, Maryland, New Mexico, Texas, and Virginia receive state funding.

34.     Methadone is a synthetic opioid used to treat opioid dependence. Colonial's centers dispense methadone to patients in pill or liquid form.

35.     These centers also dispense buprenorphine, a partial opioid agonist, and naloxone, an opioid antagonist.

36.     Buprenorphine is a partial opioid agonist, which means its opioid effects are limited when compared to full opioid agonists like Oxycontin or heroin.

37.     Conversely, naloxone is an opioid antagonist. It binds to brain receptors and blocks them by preventing the receptors from being activated by opioids.

38.     Buprenorphine is dispensed in the form of Subutex tablets.

39.     A buprenorphine and naloxone sublingual combination is dispensed in the form of Suboxone tablets.

40.     The dispensing of these opioid drugs to aid in the treatment of opioid addiction by Colonial means its centers are required to comply with state, local, and federal regulations in order to remain accredited and, thus, qualified under section 303(g) of the Controlled Substances Act (21 U.S.C. § 823(g)).

41.     Each center is required to have licensure, registration, or approval from State Boards of Pharmacy, the State Methadone Authority ("SMA"), the Drug Enforcement Administration ("DEA"), Substance Abuse Mental Health Services Administration ("SAMHSA"), and the Center for Substance Abuse Treatment ("CSAT").

42.     Colonial's centers must also meet accreditation standards set forth by the Commission on the Accreditation of Rehabilitation Facilities ("CARF").

43.     The drug doses dispensed by Colonial are meant to stabilize the addict patient so that he or she may engage in efforts to treat the underlying addiction.

9

44. The doses alone are not the patient's primary treatment. Counseling is the backbone of addiction treatment and a requirement under federal law.

*Federal Law Mandates Psychosocial and Counseling Services*

45. Federal law requires both the accreditation and certification of centers dispensing methadone. 42 C.F.R. §§ 8.1 *et seq.*

46. "Accreditation" under federal law is the process of review and acceptance by an accreditation body, which is simply a body that has been approved by SAMHSA under 42 C.F.R. § 8.3, to accredit opioid treatment programs like Colonial's using opioid agonist treatment medications. 42 C.F.R. § 8.2.

47. "Certification" is the process by which SAMHSA determines an opioid treatment program is qualified to provide opioid treatment under the federal opioid treatment standards. 42 C.F.R. § 8.2. 42 C.F.R. § 8.12.

48. Colonial must provide treatment in accordance with the standards set forth in 42 C.F.R. § 8.12 and must comply with those standards as a condition of certification. 42 C.F.R. § 8.12.

49. Treatment pursuant to those standards includes completion of a psychosocial assessment and the offer and provision of various forms of counseling services to patients who receive methadone doses.

*Required services –*

(1) General. OTPs [opioid treatment program] shall provide adequate medical, counseling, vocational, educational, and other assessment and treatment services. These services must be available at the primary facility, except where the program sponsor has entered into a formal, documented agreement with a private or public agency, organization, practitioner, or institution to provide these services to patients enrolled in the OTP. The program sponsor, in any event, must be able to document that these services are fully and reasonably available. 42 C.F.R. § 8.12(f)(1).

* * *

(4) Initial and periodic assessment services. Each patient accepted for treatment at an OTP shall be assessed initially and periodically by qualified personnel to determine the most appropriate combination of services and treatment. **The initial assessment must include . . . the** medical, **psychosocial,** economic, legal, or other supportive services that a patient needs. The treatment plan also must identify the frequency with which these services are to be provided. The plan must be reviewed and updated to reflect that patient's . . . current needs for . . . social, and psychological services . . . . 42 C.F.R. § 8.12(f)(4). (Emphasis added).

(5) Counseling services.

(i) **OTPs must provide adequate substance abuse counseling to each patient as clinically necessary. This counseling shall be provided by a program counselor, qualified by education, training, or experience to assess the psychological and sociological background of patients, to contribute to the appropriate treatment plan for the patient and to monitor patient progress.** 42 C.F.R. § 8.12(f)(5)(i). (Emphasis added).

(ii) OTPs must provide counseling on preventing exposure to, and the transmission of, human immunodeficiency virus (HIV) disease for each patient admitted or readmitted to maintenance or detoxification treatment. 42 C.F.R. § 8.12(f)(5)(ii).

(iii) OTPs must provide directly, or through referral to adequate and reasonably accessible community resources, vocational rehabilitation, education, and employment services for patients who either request such services or who have been determined by the program staff to be in need of such services. 42 C.F.R. § 8.12(f)(5)(iii).

*Billing for Counseling Services and Psychosocial Evaluations Not Provided to Patients*

50.     As part of its operation, Colonial is obligated to provide these counseling services at state mandated patient-to-client ratios to, and psychosocial evaluations of, its patients with substance abuse and addiction issues.

51.     At the centers receiving federal and state funds, Colonial engaged in a fraudulent scheme with the knowledge, approval, and participation of Colonial General, Warwick, Warwick II, and Kozak, whereby it would submit bills to federal or state governments or both and receive

payment for services it was not providing or was providing in a deficient manner, primarily federal and state mandated counseling and psychosocial evaluations, often at the expense of the fragile population of addicted patients Colonial holds itself out as treating.

52.     Upon information and belief, counseling services and the administration of methadone is billed by Colonial under the following HCPCS codes:

> H0020 – Covers the administration of the methadone dose.
> H0001 – Covers drug assessment.
> H0004 – Covers counseling and therapy, per 15 minutes.
> H0005 – Covers drug services; group counseling by a clinician.
> H0032 – Covers mental health service plan development by non-physician.

53.     Although there is not a specific CPT code for bupernorphine therapy, such therapy may be billed by Colonial under "Evaluation and Management" services (99201-99205) or billed as follows:

> 90791 – Psychiatric diagnostic evaluation (no medical services).
> 90832 – Psychotherapy, 30 minutes with patient or family member.
> 90834 – Psychotherapy, 45 minutes with patient or family member.
> 90837 – Psychotherapy, 60 minutes with patient or family member.

54.     Colonial's marketing literature recognizes, and holds Colonial out as providing, federally mandated services and assessments.

55.     In reality, these services and evaluations are routinely absent from Colonial's treatment protocols.

56.     The requirement to complete a psychosocial evaluation is often ignored or incomplete assessments are performed as cost saving measures and to generate greater profit, resulting in great harm to Colonial's patients, including prolonged methadone dosing treatments, relapse, and even death.

57.     Colonial's failure to provide mandated assessment and counseling services has resulted and continues to result in false claims for payment by federal and state governments on a massive scale.

58.     As a result of Colonial's fraudulent billing practices, it receives a windfall to the detriment of its fragile patients.

59.     On August 9, 2011, Relator Hille complained to Ford of Colonial's failure to provide counseling services and psychosocial evaluations at its Greensboro (North Carolina) Metro Treatment Center in North Carolina.

60.     Similarly, after a review of this same center, the North Carolina Department of Health and Human Services found the facility failed to provide or secure individual, group, or family therapy for clients.

61.     Moreover, the Greensboro center failed to ensure that patients in continuous treatment attended a minimum of two counseling sessions per month during the first year and one counseling session per month after the first year.

62.     Regarding the Eau Claire (Wisconsin) center, Relator Hille prepared a September 5, 2011, memorandum to Ford, concerning, inter alia, sufficiency of counseling and counselors' failures to complete patients' psychosocial evaluations.

63.     In an October 2011 memo to Ford, Relator Hille also addressed the lack of complete psychosocial evaluations at the New Hanover Treatment Center in North Carolina.

64.     In November 2011, during her compliance visits to Colonial's Columbia (South Carolina) Metro Treatment Center, Relator Hille randomly pulled counseling charts for review. She found deficiencies in 12 of the 15 charts she reviewed. She reported her findings to Ford.

13

*Failure to Staff Qualified Counselors*

65.     As a result of its calculated failure to provide the mandated counseling services, Colonial pockets a greater percentage of profit from the fee paid to it by Medicare and Medicaid.

66.     It is expensive to staff qualified counselors at defined patient-to-counselor ratios.

67.     Pursuant to federal law, each person engaged in the treatment of opioid addiction must have sufficient education, training, and experience, or any combination thereof, to enable that person to perform the assigned functions of his or her position. 42 C.F.R. § 8.12(d).

68.     Addiction counselors must also comply with credentialing requirements. *Id.*

69.     The vast majority of Colonial's counselors do not have sufficient training or credentials to perform the assigned functions of their positions.

70.     Although some counselors have a degree, they usually do not have any addiction training.

71.     Relator Hille once met with approximately 40 staff members in one of Colonial's Jacksonville, Florida centers and asked whether they had the 270 alcohol and drug hours and 300 practicum hours necessary for certification. Incredibly, only two staff members confirmed they had the requisite hours of training.

72.     In practice, a counselor is hired, placed at a desk, assigned a large caseload and simply told to "handle it."

73.     Unfortunately, this is the norm and not the exception throughout Colonial's centers because of the payroll and other expenses associated with adequately credentialed and trained counselors.

14

*Failure to Staff Counselors at Mandated Ratios and Capped Centers*

74.    Colonial's failure to staff a sufficient number of counselors in its centers significantly affected its ability to actually provide the counseling services for which it billed federal and state governments.

75.    A center becomes "capped" when it is required to involuntarily restrict intake of patients because it exceeds its counselor-to-patient ratios or other medical personnel ratios.

76.    Counselor-to-patient ratios are mandated by state law in Colorado, Georgia, Indiana, Maryland, Maine, Minnesota, North Carolina, South Carolina, Texas, and Wisconsin. Colonial's centers in each of these states receive either federal or state funding or both.

77.    In Maine, for example, with a limited exception involving periods where a center is recruiting replacement staff, there must be at least one counselor for every 50 patients. (Maine Regulations for Licensing and Certifying of Substance Abuse Treatment Programs, 14-118 CMR, Chapter 5, § 19.1.1.1, § 19.83.2.1, § 19.8.8.6.3).

78.    Similarly, a counselor in a program treating intravenous drug abusers in Colonial's Minnesota centers may not supervise more than 50 clients. (Minn. R. 9530.6445, Subpart 4).

79.    Georgia, North Carolina, Maryland, and Texas also require a minimum of one counselor to each 50 clients or patients. (Ga. Comp. R & Regs. § 290-9-10-.10(1)(g); 10 NCAC, § 14V.3603(a); COMAR § 10.47.02.11(C)(1); 25 Tx. Admin Code § 229.145(a)(5)).

80.    South Carolina code provides for at least one full time counselor on staff for every 50 clients. (S.C. Admin. Code § 61-93.3216(D)).

81.    Likewise, Wisconsin requires centers such as Colonial's to employ substance abuse counselors, substance abuse counselors-in-training, or clinical substance abuse counselors

who are under the supervision of a clinical supervisor on a ratio of at least one to 50 patients in the service or fraction thereof. (Wis. Admin. Code § DHS 75.15(4)(d)).

82.     Indiana requires one full time counselor for a minimum of 40 hours per week for every 55 enrolled patients. (Ind. Admin. Code 440 § 10-4-13(f)(6)).

83.     New Hampshire regulations provide no specific counselor to patient ratio but instead require a sufficient number of staff. Moreover, methadone maintenance treatment in New Hampshire centers shall include counseling and rehabilitation. (He-A 304.09(a)(2)).

84.     Virginia's regulations do not specifically set forth a numerical ratio. However, a Virginia Opioid Treatment Authority program manager told Brack Jefferys ("Jefferys"), Colonial's former National Director of Operations, in a June 28, 2012, email that Virginia recommends a counselor-to-staff ratio of 1:45 and not to exceed 50.

85.     New Mexico requires staffing of substance abuse counselors in a number sufficient to ensure patients have access to counselors and to provide treatment in accordance with the patient's treatment plan, as well as unscheduled treatment. (N.M. Admin. Code § 7.32.8.25(B)).

86.     These staffing ratios and other requirements were communicated to Kozak by Hassan.

87.     Colonial's administrators, including Hassan, Kozak, and Jeffreys, knew that lack of staffing was a serious issue at Colonial.

88.     After an inspection in May 2011, the North Carolina Department of Health and Human Services found Colonial's Greensboro Metro Treatment Center had failed to provide a minimum of one certified drug abuse or certified substance abuse counselor for every 50 clients and increment thereof.

16

89.     Until state methadone authorities, usually the SMA, began keeping close track of Colonial's census numbers in relation to counselor and other medical personnel staffing ratios, Colonial consistently *exceeded* the ratios and was frequently out of compliance as a result of its calculated failure to staff a sufficient number of qualified counselors.

90.     Even with increased scrutiny, Colonial is still frequently out of compliance.

91.     For example, Colonial's failure to staff a sufficient number of counselors in its centers and provide mandatory counseling services was addressed by the State Methadone Authority for the State of Virginia in early 2013. It found that Colonial's centers in Virginia had unacceptable caseloads for counselors, most counseling staff were inexperienced, there was an inability to provide adequate clinical supervision, counselors were not able to meet with patients for requisite twice a month sessions, and there were not enough group sessions offered and the groups that were offered were not therapy groups.

92.     The Virginia State Methadone Authority expressed its ongoing frustration that no matter how often it attempted to bring Colonial into compliance, Colonial failed to make any of the required changes.

93.     These were issues common to Colonial's centers in Maine, Minnesota, New Hampshire, North Carolina, South Carolina, and Wisconsin. For example, in North Carolina, the NC Department of Health and Human Services interviewed the program director of the Greensboro Metro Treatment Center in May 2011, who admitted that the counselors were untrained, uncertified, and failed to provide the required counseling services.

94.     On an October 2011 compliance visit to Colonial's Lake Superior Metro Treatment Center in Duluth, Minnesota, Relator Hille personally witnessed the inadequate staffing and untrained counselors.

17

95.     Minnesota regulations cap methadone centers at a 50 to 1 client-to-counselor ratio (Minn. R. 9530.6445, Subpart 4), but the Lake Superior center had a ratio of 101.25 clients for every one counselor, more than double the state's maximum allowance.

96.     Relator Hille witnessed similar understaffing on a November 2011 compliance visit to the Durham, North Carolina center.

97.     As a result of the increased scrutiny, state methadone authorities frequently capped Colonial's out-of-compliance centers from accepting additional patients until staffing patterns were in compliance.

*Failure to Follow Stringent Unsupervised "Take-Home" Dose Criteria*

98.     42 C.F.R. § 8.12 sets forth federal standards for the administration and management of opioid treatment. Included in the standards are a schedule of maximum allowable unsupervised use (i.e., take-home medications), and standards for the provision of detoxification treatment:

8.12(i) Unsupervised or "take-home" use. To limit the potential for diversion of opioid agonist treatment medications to the illicit market, opioid agonist treatment medication dispensed to patients for unsupervised use shall be subject to the following requirements.

> (1) Any patient in comprehensive maintenance treatment may receive a single take-home dose for a day that the clinic is closed for business, including Sundays and State and Federal holidays.

> (2) treatment program decision on dispensing opioid treatment medications to patients for unsupervised use beyond that set forth in paragraph (i)(1) of this section, shall be determined by the medical director. In determining which patients may be permitted unsupervised use, the medical director shall consider the following take-home criteria in determining whether a patient is responsible in handling opioid drugs for unsupervised use.

> (i) Absence of recent abuse of drugs (opioid or nonnarcotic), including alcohol;

> (ii) Regularity of clinic attendance;

> (iii) Absence of serious behavioral problems at the clinic;

18

(iv) Absence of known recent criminal activity, e.g., drug dealing;

(v) Stability of the patient's home environment and social relationships;

(vi) Length of time in comprehensive maintenance treatment;

(vii) Assurance that take-home medication can be safely stored within the patient's home; and

(viii) Whether the rehabilitative benefit the patient derived from decreasing the frequency of clinic attendance outweighs the potential risks of diversion.

(3) Such determinations and the basis for such determinations consistent with the criteria outlined in paragraph (i)(2) of this section shall be documented in the patient's medical record. If it is determined that a patient is responsible in handling opioid drugs, the following restrictions apply:

(i) During the first 90 days of treatment, the take-home supply (beyond that of paragraph (i)(1) of this section) is limited to a single dose each week and the patient shall ingest all other doses under appropriate supervision as provided for under the regulations in this subpart.

(ii) In the second 90 days of treatment, the take-home supply (beyond that of paragraph (i)(1) of this section) is two doses per week.

(iii) In the third 90 days of treatment, the take-home supply (beyond that of paragraph (i)(1) of this section) is three doses per week.

(iv) In the remaining months of the first year, a patient may be given a maximum 6-day supply of take-home medication.

(v) After 1 year of continuous treatment, a patient may be given a maximum 6-day supply of take-home medication.

(vi) After 2 years of continuous treatment, a patient may be given a maximum one-month supply of take-home medication, but must make monthly visits.

42 C.F.R. § 8.12(i).

99.     Colonial routinely fails to consider these criteria before dispensing unsupervised or take-home doses to its patients.

100.    Regarding the first criteria (absence of recent abuse of drugs), 42 C.F.R. § 8.12(6) (Drug abuse testing services) provides some guidance.

101.    OTPs like Colonial must provide adequate testing or analysis for drugs of abuse, including at least eight random drug abuse tests per year, per patient in maintenance treatment, in accordance with generally accepted clinical practice.

102.    For patients in short-term detoxification treatment, the OTP shall perform at least one initial drug abuse test.

103.    For patients receiving long-term detoxification treatment, the program shall perform initial and monthly random tests on each patient.

104.    Upon information and belief, Colonial routinely fails to test its take-home patients for the absence of recent abuse of drugs or to otherwise administer at least eight random drug tests per year.

105.    Upon information and belief, Colonial similarly fails to perform at least eight random drug tests per year on its non-take home patients.

106.    As a condition for certification, Colonial is required to provide opioid treatment under the federal opioid treatment standards.

107.    Such treatment includes drug abuse testing as a condition for dispensing, and thus billing for, unsupervised or take-home methadone doses and, indeed, any dose dispensed by Colonial.

108.    As a result, Colonial routinely submits false claims relating to unsupervised or take-home doses, as well as its in-house doses, to federal and state governments for payment.

20

109.     The take-home schedule defined in 42 CFR § 8.12(i)(3) represents a minimum standard. States and treatment programs may choose a more stringent standard, e.g., require longer time periods of stability, or provide fewer total take-home doses.

110.     In addition, simply because an individual patient meets the time-in-treatment criteria for take-home doses according to the schedule, the patient is not automatically eligible to receive those take-home medications.

111.     The decision as to whether or not an individual patient should receive take-home medication is a medical decision that is made by the medical director (physician) of the program based upon the 42 C.F.R. § 8.12(i) criteria.

112.     The physician must assess each patient's progress and determine whether the rehabilitative benefit derived from decreasing the frequency of attendance outweighs any potential risks.

113.     Given the lack of counseling and psychosocials provided to its patients as discussed herein, Colonial's decision to allow take-homes fails to take into account most of the 42 C.F.R. § 8.12(i) criteria, including regularity of clinic attendance, stability of the patient's home environment and social relationships, whether the rehabilitative benefit the patient derived from decreasing the frequency of clinic attendance outweighs the potential risks of diversion, all of which results in the dispensing of, and fraudulent billing for, unsupervised or take-home doses.

*LPNs Performing Job Duties Beyond Legally-Defined Scope*

114.     As a further cost saving measure, Colonial allowed its licensed practical nurses ("LPNs") to perform the duties of RNs, which, upon information and belief, has resulted in additional false claims submitted by Colonial to federal and state governments.

21

115.    In April 2013, the North Carolina Board of Nursing recognized the serious issue of unsupervised LPNs at Colonial's centers, finding that "LPNs in CMG [Colonial Management Group, LP] clinics are routinely functioning beyond their legally-defined scope of practice." In an April 2013 letter, the Board informed Hassan and Jefferys that the LPNs were making assessments and judgments in both the initial induction phase of care and in determining client impairment that "far exceed[ed] their legal scope." This was also an issue in all of Colonial's centers.

*Kozak's Personal Interests*

116.    Colonial loaned Kozak a considerable amount of money to purchase stock in the company. Kozak's plan was to repay the loan through stock distributions, which was not done on a consistent basis.

117.    Given Kozak's agenda and Colonial's business model of understaffing counselors and other treatment staff, Colonial developed a reputation for putting cash before patient care.

118.    In January 2013, Hassan submitted a draft budget to Kozak for 2013 which projected $2.0 mm in salary and wages for additional staff to meet regulatory compliance ratios in targeted states. Kozak balked at Hassan's request.

119.    From then on, Hassan regularly challenged Kozak on these points, emphasizing that Colonial's ongoing failures to sufficiently staff the centers violated state regulatory minimum requirements.

120.    For example, in a January 15, 2013 email, Hassan emphasized that the state regulations were not discretionary, that Colonial had historically understaffed its clinics in violation of these regulations, and that state and federal agencies were looking for these types of violations.

121.    Hassan was terminated five months later for his internal reporting and other efforts to stop the ongoing violations of the False Claims Act.

122.    Relator Keene was terminated within three days of Hassan's termination.

123.    Relator Keene was informed that she was being fired because, with the termination of Hassan, her services as executive assistant to the CEO were no longer required (even though Kozak became Colonial's acting CEO immediately upon Hassan's termination).

## COUNT I
## VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) – FEDERAL FCA
## (Against All Defendants)

124.    Relators hereby incorporate the allegations set forth in paragraphs 1 through 123 by reference.

125.    Defendants knowingly, or in reckless disregard or deliberate ignorance of the falsity of the information involved, presented, or caused to be presented, false or fraudulent claims for payment or approval to the federal government.

126.    As a result of Defendants' fraudulent actions, the United States has suffered damages.

127.    Relators have retained counsel to represent them in this matter and have incurred, and will continue to incur, attorneys' fees and costs.

## COUNT II
## VIOLATION OF COLORADO REVISED STATUTE § 25.5-4-305 - COLORADO
## MEDICAID FALSE CLAIMS ACT

128.    Relators hereby incorporate the allegations set forth in paragraphs 1 through 123 by reference.

129.    As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the Colorado

Medicaid program numerous false or fraudulent claims for payment or approval, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(a).

130.    As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(b).

131.    As set forth above, Defendants, by and through their agents, officers and employees, conspired to commit a violation of the Colorado Medicaid False Claims Act, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(g).

132.    Due to Defendants' conduct, the State of Colorado has suffered substantial monetary damages.

133.    The State of Colorado is entitled to treble damages based upon the amount of damage sustained by the State of Colorado as a result of the aforementioned violations of the Colo. Rev. Stat. § 25.5-4-305(1), an amount that will be proven at trial.

134.    The State of Colorado is entitled to a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) as required by Colo. Rev. Stat. § 25.5-4-305(1) for each of the fraudulent claims.

135.    Relators are also entitled to reasonable expenses which the court finds to have been necessarily incurred and reasonable attorney's fees and costs, pursuant to Colo. Rev. Stat. § 25.5-4-306(4).

**COUNT III**
**VIOLATION OF O.C.G.A. § 49-4-168.1 - GEORGIA FALSE MEDICAID CLAIMS ACT**

136.    Relators hereby incorporate the allegations set forth in paragraphs 1 through 123 by reference.

137.    As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the Georgia Medicaid program numerous false or fraudulent claims for payment or approval, in violation of O.C.G.A. § 49-4-168.1(a)(1).

138.    As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of O.C.G.A. § 49-4-168.1(a)(2).

139.    As set forth above, Defendants, by and through their agents, officers and employees, conspired to commit a violation of the State False Medicaid Claims Act, in violation of O.C.G.A. § 49-4-168.1(a)(3).

140.    Due to Defendants' conduct, the State of Georgia has suffered substantial monetary damages.

141.    The State of Georgia is entitled to treble damages based upon the amount of damage sustained by the State of Georgia as a result of the aforementioned violations of the State False Medicaid Claims Act, O.C.G.A. § 49-4-168.1, an amount that will be proven at trial.

142.    The State of Georgia is entitled to a civil penalty of between $5,500 and $11,000 as required by O.C.G.A. § 49-4-168.1 for each of the fraudulent claims.

143.    Relators are also entitled to reasonable expenses which the court finds to have been necessarily incurred and reasonable attorney's fees and costs, pursuant to O.C.G.A. § 49-4-168.2(i).

**COUNT IV**
**VIOLATION OF INDIANA CODE § 5-11-5.5-2 – INDIANA FALSE CLAIMS AND**
**WHISTLEBLOWER PROTECTION ACT**

144.    Relators hereby incorporate the allegations set forth in paragraphs 1 through 123 by reference.

145.    As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the Indiana Medicaid program numerous false or fraudulent claims for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(1).

146.    As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements to obtain payment or approval of a false claim from the state, in violation of Ind. Code § 5-11-5.5-2(b)(2).

147.    As set forth above, Defendants, by and through their agents, officers and employees, conspired to commit a violation of the Indiana False Claims and Whistleblower Protection Act, in violation of Ind. Code § 5-11-5.5-2(b)(7).

148.    Due to Defendants' conduct, the State of Indiana has suffered substantial monetary damages.

149.    The State of Indiana is entitled to treble damages based upon the amount of damage sustained by the State of Indiana as a result of the aforementioned violations of the Ind. Code § 5-11-5.5-2(b), an amount that will be proven at trial.

150.    The State of Indiana is entitled to a civil penalty of not less than five thousand dollars ($5,000) as required by Ind. Code § 5-11-5.5-2(b) for each of the fraudulent claims.

151.    Relators are also entitled to reasonable expenses which the court finds to have been necessarily incurred and reasonable attorney's fees and costs, pursuant to Ind. Code § 5-11-5.5-6(a).

## COUNT V
## VIOLATION OF MARYLAND CODE ANNOTATED § 2-602 – MARYLAND FALSE HEALTH CLAIMS ACT

152.    Relators hereby incorporate the allegations set forth in paragraphs 1 through 123 by reference.

153.    As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the Maryland Medicaid program numerous false or fraudulent claims for payment or approval, in violation of Md. Code Ann. § 2-602(a)(1).

154.    As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of Md. Code Ann. § 2-602(a)(2).

155.    As set forth above, Defendants, by and through their agents, officers and employees, conspired to commit a violation of the Maryland False Health Claims Act, in violation of Md. Code Ann. § 2-602(a)(3).

156.    As set forth above, Defendants, by and through their agents, officers and employees, knowingly made other false or fraudulent claims against a State health plan or a State health program, in violation of Md. Code Ann. § 2-602(a)(9).

157.    Due to Defendants' conduct, the State of Maryland has suffered substantial monetary damages.

27

158.    The State of Maryland is entitled to treble damages based upon the amount of damage sustained by the State of Maryland as a result of the aforementioned violations of the Md. Code Ann. § 2-602(b)(1)(ii), an amount that will be proven at trial.

159.    The State of Maryland is entitled to a civil penalty of not more than ten thousand dollars ($10,000) as required by Md. Code Ann. § 2-602(b)(1)(i) for each of the fraudulent claims.

160.    Relators are also entitled to reasonable expenses which the court finds to have been necessarily incurred and reasonable attorney's fees and costs, pursuant to Md. Code Ann. § 2-605(a).

**COUNT VI**
**VIOLATION OF MINNESOTA STATUTE § 15C.02 – MINNESOTA FALSE CLAIMS ACT**

161.    Relators hereby incorporate the allegations set forth in paragraphs 1 through 123 by reference.

162.    As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the Minnesota Medicaid program numerous false or fraudulent claims for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

163.    As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of Minn. Stat. § 15C.02(a)(2).

164.    As set forth above, Defendants, by and through their agents, officers and employees, conspired to commit a violation of the Minnesota False Claims Act, in violation of Minn. Stat. § 15C.02(a)(3).

28

165.    Due to Defendants' conduct, the State of Minnesota has suffered substantial monetary damages.

166.    The State of Minnesota is entitled to treble damages based upon the amount of damage sustained by the State of Minnesota as a result of the aforementioned violations of the Minn. Stat. § 15C.02(a), an amount that will be proven at trial.

167.    The State of Minnesota is entitled to a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) as required by Minn. Stat. § 15C.02(a) for each of the fraudulent claims.

168.    Relators are also entitled to reasonable expenses which the court finds to have been necessarily incurred and reasonable attorney's fees and costs, pursuant to Minn. Stat. § 15C.12.

## COUNT VII
## VIOLATION OF NEW MEXICO STATUTE § 27-14-2 – NEW MEXICO MEDICAID FALSE CLAIMS ACT

169.    Relators hereby incorporate the allegations set forth in paragraphs 1 through 123 by reference.

170.    As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the New Mexico Medicaid program numerous false or fraudulent claims for payment or approval, in violation of N.M. Stat. § 27-14-4(A).

171.    As set forth above, Defendants, individually and by and through their agents, officers, and employees, made, used or caused to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false, in violation of N.M. Stat. § 27-14-4(C).

172.     As set forth above, Defendants, individually and by and through their agents, officers and employees, conspired to defraud the State by getting a false or fraudulent claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent, in violation of N.M. Stat. § 27-14-4(D).

173.     Due to Defendants' conduct, the State of New Mexico has suffered substantial monetary damages.

174.     The State of New Mexico is entitled to treble damages based upon the amount of damage sustained by the State of New Mexico as a result of the aforementioned violations of the N.M. Stat. § 27-14-4, an amount that will be proven at trial.

175.     Relators are also entitled to reasonable expenses which the court finds to have been necessarily incurred and reasonable attorney's fees and costs, pursuant to N.M. Stat. § 27-14-9.

## COUNT VIII
## VIOLATION OF NORTH CAROLINA GENERAL STATUTE § 1-607 – NORTH CAROLINA FALSE CLAIMS ACT

176.     Relators hereby incorporate the allegations set forth in paragraphs 1 through 123 by reference.

177.     As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the North Carolina Medicaid program numerous false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

178.     As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

179. As set forth above, Defendants, individually and by and through their agents, officers and employees, conspired to commit a violation of the North Carolina False Claims Act, in violation of N.C. Gen. Stat. § 1-607(a)(3).

180. Due to Defendants' conduct, the State of North Carolina has suffered substantial monetary damages.

181. The State of North Carolina is entitled to treble damages based upon the amount of damage sustained by the State of North Carolina as a result of the aforementioned violations of the N.C. Gen. Stat. § 1-607(a), an amount that will be proven at trial.

182. The State of North Carolina is entitled to a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) as required by N.C. Gen. Stat. § 1-607(a) for each of the fraudulent claims.

183. Relators are also entitled to reasonable expenses which the court finds to have been necessarily incurred and reasonable attorney's fees and costs, pursuant to N.C. Gen. Stat. § 1-610.

## COUNT IX
## VIOLATION OF TEXAS CODE § 36.002 – TEXAS MEDICAID FRAUD PREVENTION

184. Relators hereby incorporate the allegations set forth in paragraphs 1 through 123 by reference.

185. As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly made or caused to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized, in violation of Tex. Code § 36.002(1).

31

186.    As set forth above, Defendants, individually and by and through their agents, officers and employees, knowingly made, caused to be made, induced, or sought to induce the making of a false statement or misrepresentation of material fact concerning the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, in violation of Tex. Code § 36.002(4)(A).

187.    As set forth above, Defendants, individually and by and through their agents, officers and employees, knowingly made, caused to be made, induced, or sought to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program, in violation of Tex. Code § 36.002(4)(B).

188.    As set forth above, Defendants, individually and by and through their agents, officers and employees, conspired to commit a violation of the Texas Medicaid Fraud Prevention, in violation of Tex. Code § 36.002(9).

189.    Due to Defendants' conduct, the State of Texas has suffered substantial monetary damages.

190.    The State of Texas is entitled to double damages and interest based upon the amount of damage sustained by the State of Texas as a result of the aforementioned violations of the Tex. Code § 36.052(a), an amount that will be proven at trial.

191.    The State of Texas is entitled to a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) as required by Tex. Code § 36.052(a)(3)(B) for each of the fraudulent claims.

192.    Relators are also entitled to reasonable expenses which the court finds to have been necessarily incurred and reasonable attorney's fees and costs, pursuant to Tex. Code § 36.110.

**COUNT X**
**VIOLATION OF VIRGINIA CODE ANNOTATED § 8.01-216.3 – VIRGINIA FRAUD**
**AGAINST TAXPAYERS ACT**

193.    Relators hereby incorporate the allegations set forth in paragraphs 1 through 123 by reference.

194.    As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the Virginia Medicaid program numerous false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

195.    As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

196.    As set forth above, Defendants, individually and by and through their agents, officers and employees, conspired to commit a violation of the Virginia Fraud Against Taxpayers Act, in violation of Va. Code Ann. § 8.01-216.3(A)(3).

197.    Due to Defendants' conduct, the State of Virginia has suffered substantial monetary damages.

198.    The State of Virginia is entitled to treble damages based upon the amount of damage sustained by the State of Virginia as a result of the aforementioned violations of the Va. Code Ann. § 8.01-216.3(A), an amount that will be proven at trial.

199.    The State of Virginia is entitled to a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) as required by Va. Code Ann. § 8.01-216.3(A) for each of the fraudulent claims.

200.    Relators are also entitled to reasonable expenses which the court finds to have been necessarily incurred and reasonable attorney's fees and costs, pursuant to Va. Code Ann. § 8.01-216.7.

**COUNT XI**
**VIOLATION OF 31 U.S.C. § 3730 – RETALIATION**

201.    Relators hereby incorporate the allegations set forth in paragraphs 1 through 123 by reference.

202.    Colonial violated Relator Keene's rights pursuant to 31 U.S.C. § 3130(h) by retaliating against her for lawful acts done by an associated other – her boss, former CEO Christopher Hassan – in furtherance of an action under the False Claims Act and other efforts to stop one or more violations alleged in this action.

203.    As a result of Colonial's actions, Relator Keene has suffered damages in an amount to be shown at trial.

**DEMAND FOR RELIEF**

WHEREFORE, Relators demand judgment against Defendants for:

(a)    awarding the United States treble damages sustained by it for each of the false claims;

(b)    awarding the United States a civil penalty of $11,000 for each of the false claims and statements;

(c)    awarding the States treble damages sustained by it for each of the false claims;

(d)     awarding the States civil penalties for each of the false claims;

(e)     awarding Relator thirty percent (30%) of the proceeds of this action and any
        alternate remedy or the settlement of any such claim;

(f)     awarding Relator special damages resulting from the retaliation pursuant to 31
        U.S.C. § 3730(h);

(g)     awarding Relator her litigation costs and reasonable attorneys' fees; and

(h)     granting such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Relators hereby respectfully demand trial by jury on all issues and counts triable as of
right before a jury.

Dated: September 4, 2015

                                        Respectfully submitted,

                                        *Jill S. Schwartz*

                                        Jill S. Schwartz, Esquire
                                        Florida Bar No. 523021
                                        Christopher A. Pace, Esquire
                                        Florida Bar No. 676721
                                        655 W. Morse Boulevard, Suite 212
                                        Winter Park, Florida 32789-3745
                                        Telephone: (407) 647-8911
                                        Facsimile:  (407) 628-4994
                                        jschwartz@schwartzlawfirm.net
                                        cpace@schwartzlawfirm.net

                                        Julie Bracker, Esquire
                                        Georgia Bar No. 073803
                                        Jason Marcus, Esquire
                                        Georgia Bar No. 949698
                                        Bracker & Marcus LLC
                                        3225 Shallowford Road, Ste 1120
                                        Marietta, Georgia 30062
                                        Telephone: (770) 988-5035
                                        Facsimile: (678) 648-5544
                                        Julie@fcacounsel.com
                                        Jason@fcacounsel.com